UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TERESA ELWARD, LEASA BRITTENHAM, ) | |
| TONY and LAUREN FITZGERALD, ) | |
| BETHANY WILLIAMS, JOHN ) | |
| MCLAUGHLIN, and STACY CISCO, ) | |
| ) | |
| ) | No. 15 C 9882 |
| Plaintiffs, ) | |
| ) | Judge Rebecca R. Pallmeyer |
| v. ) | |
| ) | |
| ELECTROLUX HOME PRODUCTS, INC., ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM OPINION AND ORDER

Seven individual Plaintiffs have sued Electrolux Home Products, Inc. ("Electrolux"), alleging that defects in Electrolux's dishwashers caused flooding and fires in Plaintiffs' homes. They bring claims under the tort and consumer protection laws of various states. In an earlier order [305], the court denied Plaintiffs' motion to certify eight classes of dishwasher users in Illinois, Indiana, Ohio, and California. What remains of the case are the Plaintiffs' individual claims. Defendant has moved for summary judgment on those remaining claims [322] and, for the reasons discussed below, the motion is granted.

BACKGROUND

The court assumes familiarity with the factual background of this case, presented in the court's opinion denying class certification. (*See Elward v. Electrolux Home Prod., Inc.*, No. 15-CV-09882, 2020 WL 2850982 (N.D. Ill. June 1, 2020) [305].) The court nonetheless briefly recounts the factual and procedural history relevant to resolving the present motion—primarily, facts relating to each of the remaining Plaintiffs' claims, and the effects of the court's denial of Plaintiffs' class certification motion in 2020.[1]

---

[1]        This case was reassigned to this court by agreement on June 13, 2024 [351].

## I.    Factual Background

Before a review of the facts, some caveats about the record in this case:  First, as discussed further below, this court has already excluded the opinions of Plaintiffs' expert, Robert O'Shea.  *See Elward*, 2020 WL 2850982, at *15.  Second, while Defendant provided a Local Rule 56.1 Statement of Material Facts (which, save for a few paragraphs, Plaintiffs do not dispute), the Plaintiffs did not provide their own Statement of Additional Facts.[2]  (*See* Def. Electrolux Home Products, Inc.'s LR 56.1 Statement of Undisputed Material Facts in Support of its Mot. for Summ. J. (hereinafter "DSOF") [327]; Pls.' Resp. to Def. Electrolux Home Products, Inc.'s LR 56.1 Statement of Undisputed Material Facts in Supp. of its Mot. for Summ. J. (hereinafter "DSOF Resp.") [340].)  Without any additional factual submissions, the court is left to rely on Defendant's account, certain cited exhibits—mainly deposition testimony from the Plaintiffs and Defendant's representatives—and facts discussed in the opinion denying class certification, leaving little information that is unique to any individual Plaintiff's claims.

Plaintiffs' claims involve incidents of flooding or fires in their homes that they allege were caused by Electrolux's "Frigidaire"-brand dishwashers.  *Elward*, 2020 WL 2850982, at *1.  Specifically, Plaintiffs allege a failure of some combination of three interconnected elements inside the products: a "heating element," metal clips, and a plastic tub.  *Id.* at *1–2.  The heating element, made of "an outer sheath and an inner coiled wire," warms the water and dries the dishes.  *Id.*  The metal clips suspend the heating element about an inch above the plastic tub, which sits at the bottom of the dishwasher.  *Id.* at *2.  Plaintiffs allege that Defendant's plastic-tub dishwashers are defective due to

---

[2]    Where Plaintiffs do legitimately dispute Defendants' facts, the court notes this.  For facts tangential to the present motion, the court relies on its past decision denying class certification. *Elward*, 2020 WL 2850982.  Finally, Defendant's statement of facts has been filed under seal.  Recognizing the need to disclose any information dispositive to the ruling here, the court nevertheless makes every effort to avoid conveying confidential information in its recounting or analysis.  *See id.* at *1 n.1 (citing *In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000)).

failures of these elements. *Id.* They claim that the heating elements are defective in some way that causes them to "warp and bend"; that the metal clips are not strong or numerous enough to properly suspend the coils; and that the plastic tubs too easily melt when the heating elements get close enough to them. *Id.*

Around 2010, Electrolux became aware of "reported failures involving the heating element melting a hole in the plastic tub," but, according to Dennis Poyner, its "Global R&D Safety Manager for North America," Electrolux "has not identified a root cause for such failures." (DSOF ¶ 169; Dep. of Dennis Poyner, Ex. II to Mot. for Summ. J. [325-11] at 3.) Similarly, a "platform manager" for Electrolux named Ashish Verma, who provided an affidavit in 2018 as part of Electrolux's opposition to class certification, stated that the company had, "in its ongoing efforts to improve quality," investigated "occurrences" of warping in the heating elements, as well as heating elements becoming "forcibly dislodged from the clips." (Ex. JJ to Def.'s Mot. for Summ. J. [325-12] ¶ 22.) Mr. Verma claimed the "incidence rates" for these problems "are extremely low," and that the company looked at "changes it could make to its supplier, manufacturing, packaging, materials, or designs that may reduce those failures." (*Id.*) This included "evaluat[ing] and audit[ing]" the "manufacturing and shipping processes" for the heating elements, made by a company called Zoppas, as well as "examin[ing] potential causes of warping or dislodgment that can occur in the field, including thermal shock, water quality, and consumer misuse." (*Id.*) Despite these inquiries, Mr. Verma claimed that the company could not find a "root cause" of heating-element warping or dislodgment. (*Id.*; *see also* DSOF ¶ 171.)

Additionally, the company had received reports from insurance companies' investigations of two dishwasher fires—one from 2014 and one from 2015. (*See Elward*, 2020 WL 2850982, at *18; *see also* Exs. 21 & 25 to Poyner Dep. [175] at 85–92, 107–21.) One concluded that a consumer's "heating element failed causing the dishwasher tub and its contents to ignite," though the exact mechanism through which the ignition occurred was unclear. (Ex. 25 to Poyner Dep. at 111.) The other

concluded that a "manufacturer's defect in the heating element" likely caused the fire, which "originated at the heating element near the electrical connections." (Ex. 21 to Poyner Dep. at 86–87.)

Electrolux's experts and Plaintiffs' expert, Robert O'Shea, agreed that there are numerous factors that could cause the heating element to warp or dislodge, including problems in packaging, manufacture and assembly; subsequent use; "mechanical forces on the element (e.g., a protruding pot handle)"; electronic problems; and user error. (DSOF ¶¶ 70, 172–74.) Notably, Plaintiffs' expert, who inspected most of the seven Plaintiffs' dishwashers, himself testified "that he does not know and did not determine what caused the heating elements in Plaintiffs' dishwashers to deform." (*Id.* ¶¶ 24, 41; 60; 96; 173–74.)

The court now turns to each Plaintiff's allegations of injury.

## A. Bethany Williams

On July 26, 2014, Bethany Williams, a California resident, bought a "Frigidaire-brand Model FGBD2438PF3A" dishwasher at Best Buy; the Defendant had manufactured the dishwasher the previous month. (DSOF ¶¶ 8–11; *Elward*, 2020 WL 2850982, at *5.) Ms. Williams received and read the "Use & Care Guide" included with her dishwasher, which listed among the product's risks "personal injury, burns, fire, and electric shock." (DSOF ¶ 15 Ms.)

In September 2015, after a little more than a year of Ms. Williams' using the dishwasher without issue, the dishwasher's heating element "warped" and melted a hole in the dishwasher's plastic tub, causing a water leak. (*Id.* ¶¶ 21–22.) In her deposition testimony, Ms. Williams testified that she does not "want another Frigidaire product in my house," but acknowledged that she does not know what kind of warning Electrolux could or should have included with the product, beyond the warning noted above, to flag such a problem. (*Id.* ¶¶ 16, 25.)

## B. John McLaughlin

John McLaughlin, a California resident, bought his "Frigidaire-brand Model FDB520RHB2A" dishwasher around April 2011, a few months after Defendant had manufactured it. (*Id.* ¶¶ 28–29; *Elward*, 2020 WL 2850982, at *5.) Before he bought it, McLaughlin did not

"communicate with anyone at Electrolux," nor did he receive or review any "marketing materials, or . . . written statements" from the company about the dishwasher. (DSOF ¶ 32.) His new dishwasher came with the Frigidaire "Use & Care Guide," though neither party says whether he read it. (*Id.* ¶ 43.) And on August 15, 2016—after more than five years of use—the heating element warped and melted a hole in the plastic tub, which caused a water leak. (DSOF ¶¶ 38–39.)

### C. Stacy Cisco

Stacy Cisco, an Ohio resident, bought her "Frigidaire-brand Model FFBD2411NS0A" dishwasher from an appliance retailer on November 19, 2012, about a month after its manufacture. (*Id.* ¶¶ 46–49, *Elward*, 2020 WL 2850982, at *5.) The dishwasher came with a "Use & Care Guide." (DSOF ¶ 72.) Before the purchase, Ms. Cisco had no exposure to any Electrolux marketing materials or other written statements. (*Id.* ¶ 51.) About four years later, the heating element melted a hole in the plastic tub, causing a water leak. (*Id.* ¶ 56.) In Ms. Cisco's case, the heating element was found lying on the plastic tub, unattached to the metal clips. (*Id.* ¶ 57.) Accordingly, when she reported the incident a few days later to the United States Consumer Product Safety Commission, she claimed that the heating element had "dislodged from the metal clamps." (Ex. P to Def.'s Mot. for Summ. J. [325-7] at 54; DSOF ¶ 58.)

The parties dispute whether the heating element melted the tub before or after it was dislodged from the clips; Mr. O'Shea opined that the tub melted while the clips still held the heating element, whereas Electrolux's engineering expert opined that the tub melted as a result of the heating element becoming dislodged from the clips and making contact with the tub. (DSOF ¶¶ 61, 67, 69.) What could cause a heating element to be dislodged is unclear; Plaintiffs' expert identified several possibilities in the abstract, including wear and tear from loading dishes. (*Id.* ¶ 70.) The parties also dispute whether Plaintiffs' theory—that the element melted the tub before dislodgment—was even possible; that is, that the heating element was even capable of melting a hole in the plastic tub while being "secure in its clips." (*Id.* ¶¶ 67–68.)

### D.      Teresa Elward

Teresa Elward, an Illinois resident, bought a "Frigidaire-brand Model FBGD2445NF" dishwasher from Abt Appliances in March 2014, about a month after its manufacture.  (*Id.* ¶¶ 75–77.) In online research she performed before purchasing her Frigidaire, Ms. Elward saw "[r]epresentations regarding the Dishwashers," though she could not recall the content of those representations.  (*Id.* ¶¶ 78–80.)  She also testified that the only information on the internet regarding Frigidaire products on which she relied in choosing to purchase the dishwasher was price.  (*Id.* ¶ 81.)  Separately, Ms. Elward claimed that she thought a salesperson at Abt Appliances assured her that the dishwasher was a "top selling, good product."  (*Id.* ¶ 83.)  Defendant Electrolux made no statements to Ms. Elward that factored into her decision to buy her dishwasher.  (*Id.* ¶ 84.)

Ms. Elward saw the "Use & Care Guide" for the first time when she purchased the dishwasher. (*Id.* ¶¶ 85–86.)  On October 15, 2015, after the dishwasher had been used without incident for more than a year, it leaked when the heating element warped and melted a hole in the plastic tub, damaging the wood flooring in front of the dishwasher.  (*Id.* ¶¶ 91–92, 94.)

### E.      Leasa Brittenham

Leasa Brittenham, a Washington resident, bought her "Frigidaire-brand Model FFBD2411NW" dishwasher in February 2010 from a Lowe's Home Improvement store.  (*Id.* ¶¶ 101–03.)  Aside from reading the "Use & Care Guide" that came with the dishwasher to "figure out the buttons," Ms. Brittenham did not receive advertising, marketing materials, statements from Electrolux, or statements from Lowe's concerning the dishwasher, and she did not read the product's included safety information.  (*Id.* ¶¶ 104–07.)

On April 23, 2013, Ms. Brittenham's home caught fire.  (*Id.* ¶ 112.)  Later that day, someone in the fire department told her that the dishwasher might have been the source, and when Brittenham prepared a "Witness Statement" for the ensuing fire investigation, she noted that the dishwasher had

been running at the time of the fire. (*Id.* ¶¶ 113–15.) She had had no problem with the dishwasher in the years leading up to the fire. (*Id.* ¶ 126.)

Multiple entities investigated the fire. An investigation performed by Ms. Brittenham's insurance company concluded, on June 2, 2013, that the "[t]he ignition source for this fire is believed to be an operating dishwasher." (Ex. Z to Def.'s Mot. for Summ. J. [326-9] at 97.) Later, that report notes that it was unclear "what component part was primary in [the dishwasher's] failure or such." (*Id.* at 101; DSOF ¶ 117.) The City of Tacoma Fire Department also investigated and concluded that the dishwasher's heating element caused the fire. (*Id.* ¶¶ 118–19.) The insurance company took possession of the dishwasher and at some point disposed of it; as a result, neither Electrolux nor Plaintiffs' expert were able to inspect it during the litigation. (*Id.* ¶¶ 121–23.)

Accordingly, there is no direct evidence concerning whether the heating element or clips malfunctioned. (*Id.* ¶ 124.) And though a photograph of the dishwasher post-fire does exist, the parties dispute whether its mangled state rules out "melting or damage from contact with the heating element." (*Id.* ¶ 125; DSOF Resp. ¶ 125.)



(Ex. BB to Def.'s Mot. for Summ. J. [326-10] at 7.)

About a year later, in July 2014, Ms. Brittenham spoke on the phone with Electrolux employees about the dishwasher's malfunction. (DSOF ¶ 128.) When she told them about her fire,

one employee said to her that the "issue was not significant enough to – for them to do a recall or warning to other people"; the other employee helped her figure out which model dishwasher she had owned. (Ex. W to Def.'s Mot. for Summ. J. [326-9] at 73.) And later that month, Ms. Brittenham got in contact with the attorneys currently representing her in this case. (DSOF ¶ 131.)

### F.  Tony and Lauren Fitzgerald

When Tony and Lauren Fitzgerald, Virginia residents, bought a new home in 2009, it already contained a "Frigidaire-brand Model FDB1050REB2" dishwasher that had been manufactured in July 2007. (*Id.* ¶¶ 134–36.) Though it had come with a "Use & Care Guide," the previous owner did not provide it to the Fitzgeralds when they moved in. (*Id.* ¶¶ 165–66.)

After years of using the dishwasher without issue, in January 2013 a fire occurred near the machine. (*Id.* ¶¶ 142–43.) Ms. Fitzgerald testified that, on the night of the fire, someone at the fire department told her that though fire department personnel were unsure of the culprit, their "best guess" was the dishwasher's "electrical panel" or heating element. (*Id.* ¶ 146.) Neither Mr. nor Ms. Fitzgerald were able to remember, however, whether the fire department's ensuing report (which does not appear to be in the record in this case) reached any conclusions concerning what had caused the fire.[3] (*Id.* ¶¶ 145, 148.) Consistent with their view that the dishwasher was to blame, the Fitzgeralds reported the fire to Electrolux later that January and claimed that "the fire department and insurance company say it was a faulty dishwasher." (*Id.* ¶ 160.) And Mr. Fitzgerald would later testify more specifically that he "belie[ved]" the fire was caused by the heating element melting the dishwasher's plastic tub; it is unclear, however, what led to this belief. (Ex. DD to Def.'s Mot. for Summ. J. [326-10] at 28; DSOF ¶ 149.) Notably, the insurance company's inspection of the Fitzgeralds' dishwasher appeared to reach a different conclusion. An inspection in April 2013 by Rimkus Consulting Group,

---

[3]      At his deposition, Mr. Fitzgerald testified that the fire department had prepared and sent him a two- or three-page report that they shared with their insurance company and also kept for their own records "in a box with other documents." (Ex. DD to Def.'s Mot. for Summ. J. [326-10] at 40–41.) At the time of his deposition, Mr. Fitzgerald had not found or produced the report, and it does not appear that it surfaced at any later point in this litigation. (*See id.* at 41.)

Inc.—a contractor for the Fitzgeralds' insurance company—concluded that "[t]here was no evidence that the fire started on the heating element" and that "[t]here were no indications of any manufacturing defects in the dishwasher." (*Id.* ¶¶ 153–58.) By the time the Fitzgeralds first filed suit in December 2016, they had disposed of the dishwasher. (*Id.* ¶ 161–64.)

## II. Procedural Background

Ms. Elward filed an initial class action complaint in November 2015 (Compl. [1]) and amended it in June 2016 (First Am. Compl. [64]). The court dismissed the complaint in part (*see* Mem. Op. & Order [82]), and then granted the parties' joint motion to file a consolidated amended complaint adding additional plaintiffs (*see* Minute Entry [91]; Consolidated Am. Compl. [93]). Protracted discovery followed. Plaintiffs moved for class certification in October 2018 (Mot. to Certify Class [172]), and both sides moved to exclude each other's experts (*see* [191]; [196]; [197]; [199]; [201].)

### A. Class Certification Denial

In denying Plaintiffs' motion for class certification, the court observed that "Plaintiffs' entire case . . . hinges on the question of whether there is a common design defect [in Defendant's dishwashers], and in turn whether such a defect proximately caused the injuries of the putative class members." *Elward*, 2020 WL 2850982, at * 9. Plaintiffs' expert, Robert O'Shea, offered opinions as to defect and causation. *Id.* at *10–15. To inform his opinions, O'Shea examined the dishwashers of five of the named Plaintiffs—including Ms. Williams', Ms. Cisco's, Mr. McLaughlin's, and Ms. Elward's[4]—reviewed discovery, and "built and analyzed a test dishwasher." (*Id.* at *11; *see also* O'Shea Expert Report, Ex. B to Pls.' Mem. Supp. Mot. Class Cert. [175-1] at 9.) As the court pointed out in its denial of class certification, his resulting conclusions on the dishwashers' defect were "difficult to pin down," consisting of "six opinions." *Elward*, 2020 WL 2850982, at *11. The court summarized those opinions as follows:

---

[4]     The fifth dishwasher belonged to Plaintiffs Nathanial and Kathy Beck, who are no longer part of this case. (*See* Stipulation of Dismissal [336].)

(1) the 'poor design' of the heating elements and the 'insufficiency' of the materials used makes them 'unable to maintain their shape and remain at a safe distance from the plastic tub' during normal use; (2) the 'mounting clips that hold the heating elements are defective in that their design and the number of clips used are insufficient to maintain the integrity and distance of the heating element from the surface of the tub,' (3) the use of polypropylene with a UL 94 HB flammability rating is 'inappropriate for use in this high heat application,' (4) the design of the heating element when used in conjunction with the UL 94 HB rated polypropylene and the 'design / number of the clips used to hold it' all 'contribute individually and collectively' to the defect; (5) Electrolux knew 'early on' that the structural integrity of the Zoppas heating elements was 'problematic,' and (6) '[a]ll of the aforementioned deficiencies create a significant safety defect present at the point of sale of all the subject dishwashers' that would not be discoverable by consumers.

*Id.* (quoting O'Shea Expert Report at 9, 33–34). The court then parsed these opinions, describing why the reasoning supporting them fell apart under scrutiny.

First, the court discussed O'Shea's opinions on what caused the heating elements to warp. O'Shea's report noted that some of the dishwashers' heating elements consisted of two wound coils, and asserted that the interplay of the coils—pitch and spacing discrepancies—"may result in warpage forces." *Elward*, 2020 WL 2850982, at *11 (quotation omitted). But O'Shea later admitted that the heating elements could have warped for other reasons, including: "faults in the heater control system . . . errant high supply voltage . . . supplier shipping and packaging issues . . . assembly issues, and . . . user issues such as poor loading of dishracks." *Id.* at *12. The "interplay of the coils" opinion suffered from another flaw as well: not all named Plaintiffs' dishwashers contained two-coiled heating elements; some had single-coil heating elements, and those too had warped. *Id.* As the court pointed out, "O'Shea acknowledge[s] that he does not know why the heating elements warp and that his theory about the coil pitch discrepancies does not apply to all the class members' heating elements."[5] *Id.*

Nor did O'Shea's broader conception of a systemic defect—a combination of the heating elements, clips, and easily melted tub—satisfy the court. First, O'Shea opined that Electrolux used an inappropriate plastic for the tubs, a plastic whose melting point was lower than the temperatures

---

[5] The Plaintiffs do not clarify whether any or all of the remaining Plaintiffs' dishwashers in this case had single or dual-coil heating elements.

reached by the heating elements; but in support of that opinion, he offered no specific data beyond "general knowledge." He also admitted that other dishwasher manufacturers use the same plastic, undermining the conclusion that the plastic at issue was the cause of injury. *Id.* at *13. Given that O'Shea's opinions on the heating elements and plastic tubs alone did not reliably show a defect, the court turned to the final element: the clips. Again, the court found O'Shea's opinion lacking: O'Shea "merely explained that the clips are 'insufficient' in 'design and . . . number'" instead of specifically describing how the clips' design was defective. *Id.* at *13–14. O'Shea compared Electrolux's clips with those in dishwashers manufactured by General Electric and Sears Kenmore, but the court pointed out that his comparisons appeared to be "anecdotal observations" or "mere personal observation[s]" without reliable scientific backing. *Id.*

Put differently, O'Shea's theory failed at every step. He did not show that the heating elements were somehow defective, and he suggested it was not necessary to make such a showing at all:

> [A]ccording to Plaintiffs, it does not matter why the heating elements fail because the problem is the plastic tubs and metal clips; however, it is not necessary to identify a specific problem with the plastic tubs and metal clips because the problem is the entire 'system.' The court is thus left with three components—each of which could be defective or not, and each of which may or may not be the proximate cause of any melting, flooding, or fires.

*Id.* at *16–17. The court added that "O'Shea has . . . failed to explain a design defect common even to the five [named Plaintiffs'] dishwashers he studied" in preparing his report. *Id.* Accordingly, the court excluded O'Shea's testimony.

Without his testimony, little evidence remained of a defect common to the class. There were "a variety of . . . corporate documents" showing that in 2006, Electrolux had some awareness that the heating elements could warp; in 2014 and 2015, there were "two fire investigation reports . . . indicating that consumer fires originated with the heating element due to a 'manufacturer's defect'"; and over the years, Electrolux has investigated reports from consumers detailing problems with their heating elements. *Id.* at *18. The court noted that these pieces of evidence, spanning about a decade

and not accounting for changes in the dishwashers' design over those years, did not demonstrate a common defect:

> Essentially, Plaintiffs have identified little more than that the dishwashers' heating elements may warp or sag, or their clips may bend for a variety of reasons, many of which go beyond design issues to any number of issues, such as manufacturing, shipping, packaging, or other reasons. Given the many possible causes, there are simply too many possible 'failure paths' that would require the court to make individualized determinations as to causation or likely failure rates.

*Id.* Instead, the court noted that "the proximate cause and likelihood of any melting and flooding may have to be determined on an individual basis," and that "[d]ifferent experts may be needed to opine about the particular causes of or likelihood of failure for each of the subject dishwashers." *Id.* at *19. Accordingly, the court denied class certification. Additionally, because the court concluded that Plaintiffs' class certification motion failed without O'Shea, the Plaintiffs' own *Daubert* challenges to Defendant's experts had been mooted.[6] *Id.* at *1.

**B.     Subsequent Developments and Remaining Claims**

After the court denied Plaintiffs' class certification motion, Electrolux settled with numerous former Plaintiffs. (Def. Electrolux Home Products, Inc.'s Mem. in Supp. of its Mot. for Summ. J. (hereinafter "MSJ") [323] at 1;[7] *see also* [331]; [332]; [336].) At the same time, Electrolux moved for summary judgment on the remaining Plaintiffs' claims, which fell into the following general buckets: breach of the implied warranty of merchantability (all Plaintiffs); product liability (Elward, Williams, and Brittenham); various state consumer protection laws (Elward, Brittenham, McLaughlin, and Williams); negligence (Elward, the Fitzgeralds, and Williams); and fraudulent concealment (all Plaintiffs). (*See* MSJ at 1.)

In response to Defendant's motion, the Plaintiffs announced that they "no longer seek relief for breach of implied warranty under relevant state law." (Pls.' Mem. of Law in Opp. to Def.

---

[6]     Plaintiffs do not appear to have renewed their *Daubert* motions.

[7]     When citing to either party's briefing, the court uses the briefs' internal pagination.

Electrolux Home Products, Inc.'s Mot. for Summ. J. (hereinafter "MSJ Resp.") [340] at 2.) Additionally, Ms. Elward abandoned a claim under the Illinois Uniform Deceptive Trade Practices Act, leaving intact a separate claim under the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"). (*Id.* at 16.)

## DISCUSSION

What is left of this case are the claims of seven individual Plaintiffs under various states' tort and consumer protection laws. Had they been filed as individual actions, it is not at all clear that joinder would have been proper. In the interest of judicial economy, however, the court will address Defendant's motion with respect to all seven Plaintiffs whose claims largely depend on the existence of a product defect. Due to the exclusion of O'Shea's report, the court finds insufficient evidence in the record to raise a genuine issue of material fact as to the existence of a defect common to the Plaintiffs' dishwashers, and insufficient evidence specific to each Plaintiff to independently accomplish that purpose. Relatedly, each Plaintiff has failed to produce evidence establishing a material dispute as to causation. These failures, and others, require summary judgment in favor of Defendant.

## I. Legal Standard

A movant for summary judgment must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and the substantive law of the case dictates whether disputes are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, to grant summary judgment, the court must determine that "no reasonable jury could find for the nonmoving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994). In doing so, the court "construe[s] the record in the light most favorable to the nonmovant and avoid[s] the temptation to decide which party's version of the facts is more likely true." *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014) (citing *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009–10 (7th Cir. 1999)).

The non-moving party "may not rest upon mere allegations" and instead "must go beyond the pleadings and support its contentions with proper documentary evidence." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020) (quoting *Warsco v. Preferred Tech. Grp.*, 258 F.3d 557, 563 (7th Cir. 2001)). Put differently, "'mere speculation or conjecture' will not defeat a summary judgment motion." *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (quoting *Estate of Phillips v. City of Milwaukee,* 123 F.3d 586, 591 (7th Cir. 1997)). And "if it is clear that a plaintiff will be unable to satisfy the legal requirement necessary to establish its case, summary judgment is not only appropriate but required." *Ind. Funeral Dirs. Ins. Trust v. Trustmark Ins. Corp.*, 347 F.3d 652, 654 (7th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Finally, "[t]o be considered on summary judgment, evidence must be admissible at trial, though the form produced at summary judgment need not be admissible." *Aguilar v. Gaston-Camara*, 861 F.3d 626, 631 (7th Cir. 2017) (quoting *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)).

## II.    Effect of O'Shea's Exclusion

Given its centrality to this case, the court briefly pauses to address the effect the exclusion of Mr. O'Shea's report and testimony has had on the Plaintiffs' individual claims of product defect and causation.

Plaintiffs concede that O'Shea's testimony is no longer admissible in this case. (MSJ Resp. at 1 n.1.) Instead, they argue that the evidence remaining—that in 2006, Electrolux knew of problems with certain of its heating elements warping; that Electrolux has "periodically been made aware of problems with heating elements," including the two fire-investigation reports in 2014 and 2015, and complaints from consumers; and that Electrolux employees have acknowledged "such problems in [their] internal communications"—suffices to raise a genuine issue of material fact as to whether Electrolux's dishwashers suffered a design defect. (*Id.* at 7–8 (quoting *Elward*, 2020 WL 2850982, at *18).)

Plaintiffs concede as well that the court found these facts insufficient to show a class-wide defect mirroring O'Shea's theory. For example, the Plaintiffs "recognize that the Court disagreed with them" on whether "they . . . present[ed] evidence sufficient to create a genuine issue of material fact regarding whether the dishwashers' propensity to cause fires and/or floods resulted from a systemic defect created by Electrolux's poor design and component choices." (MSJ Resp. at 19, 19 n.14.) They make similar concessions—that they have failed to offer "sufficient evidence to get to a jury on the issue" of their alleged tripartite dishwasher defect—repeatedly in their briefing. (*Id.* at 13, 13 n.10; *see also id.* at 12, 12 n.8; 12, 12 n.9; 16, 16 n.11.)

The court recognizes that these concessions do not doom the Plaintiffs' individual cases per se. At least in theory, Plaintiffs' failure to show a common defect at the class-certification stage does not guarantee that any individual Plaintiff will be unable to raise a dispute of material fact in their own case precluding summary judgment. For the reasons discussed below, however, this makes no difference here. Each Plaintiff's claim largely hinges on allegations of design defect—as opposed to a manufacturing defect, for example. A design defect, if applicable to one dishwasher, is applicable to all dishwashers of the same design.[8] The court now turns to the claims Plaintiffs have brought, resolving one at a time organized first by general claim type and second by Plaintiff.

## III. Product Liability Claims

Teresa Elward, Bethany Williams, and Leasa Brittenham each bring claims under their respective states' product liability laws. The court addresses each in turn.

### A. Teresa Elward

Ms. Elward raises strict liability claims for failure to warn and design defect. (*See* Consol. Am. Compl. (hereinafter "CAC") [94] at ¶¶ 106–19.) She is an Illinois resident, and it is undisputed that Illinois law applies to her claims.

---

[8] Based on the model numbers reported above, the Plaintiffs appear to have had different dishwashers, with potentially different designs. However, they make no attempt to distinguish between them here.

1.      **Design Defect**

Illinois law allows plaintiffs to prove a product's design is defective under either a "consumer-expectation" test or a "risk-utility" test. *See Walker v. Macy's Merch. Grp., Inc.*, 288 F. Supp. 3d 840, 857 (N.D. Ill. 2017). "Where the two tests yield conflicting results . . . the risk-utility test 'trumps.'" *Ferraro v. Hewlett-Packard Co.*, 721 F.3d 842, 848 (7th Cir. 2013) (quoting *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 549, 901 N.E.2d 329, 352 (2008), *opinion modified on denial of reh'g* (Dec. 18, 2008)). Accordingly, "[u]nless 'both parties' theories of the case are framed entirely in terms of consumer expectations' . . . this "broader [risk-utility] test ... is to be applied by the finder of fact." *Id.* (quoting *Mikolajczyk*, 231 Ill. 2d at 549, 901 N.E.2d at 352). The parties both invoke the latter, so the court focuses on it here.

A plaintiff can prove design defect using the risk-utility test by "presenting evidence of the availability and feasibility of alternate designs at the time of [the product's] manufacture, or that the design used did not conform with the design standards of the industry, design guidelines provided by an authoritative voluntary association, or design criteria set by legislation or governmental regulation." *Walker*, 288 F. Supp. 3d at 862 (quoting *Winters v. Fru–Con Inc.*, 498 F.3d 734, 744 (7th Cir. 2007)).

The court sees no evidence in the record regarding Ms. Elward's dishwasher that implicates these criteria. Ms. Elward's only argument is that "there *was* evidence of potential alternative designs that could mitigate the Defect's dangers"—specifically, unsupported testimony from O'Shea that the heating element could have been supported by more or stronger clips—before the court excluded O'Shea from the case. (MSJ Resp. at 12, 12 n.9 (emphasis added).) As Defendant points out, even were this testimony admissible, it falls far short of the evidence needed for Plaintiff to make out a risk-utility claim; for example, Plaintiffs present no evidence of these imagined improvements having been actually designed or tested, let alone their cost, associated risks, and the like. *See Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001) (noting that "[i]n alternative design cases, we have

consistently recognized the importance of testing the alternative design"). Even inferring in her favor, no reasonable juror could conclude on the evidence in the record that Ms. Elward has shown a design defect under Illinois law.[9]

### 2.    Failure to Warn

A similar problem defeats Ms. Elward's failure-to-warn claim. Under Illinois law, a plaintiff must prove that the defendant did not warn of danger despite "knowledge . . . in the industry of the dangerous propensity of the manufacturer's product." *Woodill v. Parke Davis & Co.*, 37 Ill. Dec. 304, 308–09, 402 N.E.2d 194, 198–99 (Ill. 1980). "A manufacturer has a duty to warn where the product possesses dangerous propensities and there is unequal knowledge with respect to the risk of harm, and the manufacturer, possessed of such knowledge, knows or should know that harm may occur absent a warning." *Sollami v. Eaton*, 201 Ill. 2d 1, 7, 772 N.E.2d 215, 219 (2002).

The evidence Plaintiff points to in the record shows that Electrolux knew that for unknown reasons its heating elements occasionally warped, and, by 2015, fire investigations concluded that in two instances, "consumer fires [were found to have] originated with the heating element due to a 'manufacturer's defect.'"[10] (MSJ Resp. at 7 (quoting *Elward*, 2020 WL 2850982, at *18).) But this evidence again falls short. For one, neither fire report explicitly concluded that the heating element

---

[9]    Even if Elward could show a design defect via the risk-utility test, her claim suffers serious difficulties with regard to causation. *See Mikolajczyk*, 231 Ill. 2d at 543, 901 N.E.2d at 345 (noting proximate cause requirement for defective design claims). Evidence in the record shows that Ms. Elward's dishwasher flooded because the heating element warped and made contact with the plastic tub at the bottom of the machine. (DSOF ¶¶ 91–92, 94.) But there does not appear to be any evidence tying the allegedly defective design of Defendant's product to her injury; put differently, no evidence hints at what caused the heating element to warp, whether warping alone caused it to touch the bottom of the tub, and so on.

[10]    Another reason the fire reports in particular are of scant relevance to her failure-to-warn claim is that Ms. Elward purchased her dishwasher in March 2014—*before* the two fire reports the parties discuss in the record. (*See* Ex. 25 to Poyner Dep. [175] at 107 (listing report's date as September 25, 2014 and fire having occurred on March 4, 2014—the same month Ms. Elward bought her dishwasher).) The only evidence left is Electrolux's knowledge of warping and some consumers' reports of flooding, without a root cause.

melted the dishwashers' plastic tub, as Ms. Elward's did. One report claimed the heating element failed (how, exactly, is unclear) near electrical wires in the dishwasher; the other noted that the heating element failed (how, exactly, is unclear) and ignited both the plastic tub and dishwasher contents. (Ex. 21 to Poyner Dep. at 86–87; Ex. 25 to Poyner Dep. [175] at 111.) It is unclear how these reports, then, are relevant to her claim, since Ms. Elward's dishwasher did not even catch fire. Then, there is no indication that the heating elements' propensity to sag, as observed by Electrolux in the years relevant to this case, was itself dangerous, absent additional issues with the dishwashers' clips, tubs, or otherwise. Indeed, Electrolux had not even determined a "root cause" of the heating-element warping it had observed. (*See* DSOF ¶¶ 169–74; *Elward*, 2020 WL 2850982, at *18.) And Plaintiffs' expert admitted that he did not know what caused Ms. Elward's heating element to warp. (DSOF ¶ 96.) The upshot is that no evidence ties the reported heating-element sagging (or other problems of which Electrolux was aware) to the product's design, as opposed to one-off manufacturing defects or misuse by consumers. And, as the court pointed out in denying class-certification, "even a non-defective product would still have a propensity to fail sometimes." *Elward*, 2020 WL 2850982, at *17 (quoting *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, No. 14-CV-5696, 2017 WL 1196990, at *57 (N.D. Ill. Mar. 31, 2017))).

Of what concrete risk, then, was Electrolux supposed to warn? All told, no evidence bears on whether Electrolux knew that its product was inherently dangerous or defective, because there is no evidence that the product had any inherent defect or dangerous propensity. To conclude otherwise would require "mere speculation and conjecture." *McCoy*, 341 F.3d at 604 (quoting *Estate of Phillips*, 123 F.3d at 591). Because the generalized—and scant—evidence remaining in the record does not raise a triable issue as to Electrolux's knowledge of a design defect, Ms. Elward's failure-to-warn claim cannot survive.

### B.   Bethany Williams

Ms. Williams raises strict liability claims for failure to warn and design defect. (*See* CAC ¶¶ 106–19.) Because she is a California resident, California law applies to her claims.

#### 1.   Design Defect

California allows for both consumer expectations and risk-utility theories of strict liability for design defect. *Barker v. Lull Eng'g Co.*, 20 Cal. 3d 413, 432, 573 P.2d 443, 455–56 (1978). Under both tests, a plaintiff must first show that a "product did not perform as safely as it should" and that that "failure resulted from the product's design." *Soule v. Gen. Motors Corp.*, 8 Cal. 4th 548, 566, 882 P.2d 298, 308 (1994). Then, the plaintiff may argue either that a reasonable consumer would not have expected such a design, or that the risks of that design outweigh its benefits. *Id.* To prove liability under either test, then, Ms. Williams must show first, that the design of Defendant's dishwashers rendered them prone to flooding or fires; and second, either that an ordinary consumer would not expect the dishwasher to do so, or that these flooding and fire risks outweighed whatever utility lay in designing it that way. *See id.* at 308 n.3 (describing test's application).

For reasons already discussed, Ms. Williams fails at the first step. The evidence in the record simply does not raise a factual dispute about whether Electrolux's dishwashers are designed in such a way as to cause fire or flood. O'Shea's theories concerning systemic failure of the heating elements, clips, and plastic tub have been excluded. All that is left in their stead is evidence of sporadic accounts from other unknown customers of heating elements warping and two reported fires vaguely tied to the heating elements. There remains no theory—let alone evidence—that explains how Ms. Williams' dishwasher's design produced this same result. Once again, "[i]t is not enough for Plaintiffs to simply show that the Electrolux's dishwashers sometimes cause damage, since 'even a non-defective product would still have a propensity to fail sometimes.'" *Elward*, 2020 WL 2850982, at * 17 (quoting *Fluidmaster*, 2017 WL 1196990, at *57)). The court has already concluded that mere "failure to anticipate and prevent the heating elements from melting, regardless of the cause," is too low a bar

"to constitute a design defect" in this case. *Id.* So, though Ms. Williams' dishwasher flooded after her heating element burnt a hole in the plastic tub, she has failed to raise a triable issue of fact as to whether this was a potential byproduct of the dishwasher's design.[11] *See Celotex*, 477 U.S. at 322 (noting that summary judgment is required when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

### 2. Failure to Warn

In California, a plaintiff can establish a defect by proving that "a product . . . is dangerous because it lacks adequate warnings or instructions." *Webb v. Special Elec. Co.*, 63 Cal. 4th 167, 180, 370 P.3d 1022, 1030 (2016) (quoting *Brown v. Superior Ct.*, 44 Cal. 3d 1049, 1057, 751 P.2d 470, 475 (1988)). If a manufacturer is aware of a "hazard[] inherent in [its] products," it owes a duty to warn of that hazard so that users can "avoid the product or minimize its danger by careful use." *Webb*, 63 Cal. 4th at 181, 370 P.3d at 1030. As in Illinois, California failure-to-warn claims are "conditioned on the manufacturer's actual or constructive knowledge of the risk." *Id.* That is, "[w]here a manufacturer or supplier of a product is or should have been aware that the product is unreasonably dangerous absent a warning and such warning is feasible, strict liability in tort will attach if appropriate and conspicuous warning is not given." *Blackwell v. Phelps Dodge Corp.*, 157 Cal. App. 3d 372, 377, 203 Cal. Rptr. 706, 710 (Ct. App. 1984). Finally, "the absence of a warning [must] cause[] the plaintiff's injury." *Webb*, 63 Cal. 4th at 181, 370 P.3d at 1030.

---

[11] The parties appear to focus on whether Ms. Williams has shown causation, but the same problem infects that issue as well. Though the heating element warped and melted her dishwasher's plastic tub, there is no evidence in the record as to what caused this to happen—whether it was user error, manufacturing error, design, or otherwise. Plaintiffs' expert, who inspected her dishwasher, admitted he did not know what caused it to happen. (*See* DSOF ¶¶ 23–24.) Though the court must make inferences in the Plaintiff's favor, it cannot merely speculate to make up for a lack of evidence. *See McCoy*, 341 F.3d at 604. To their credit, Plaintiffs admit this in their brief. (MSJ Resp. at 12 n.8.)

Ms. Williams' failure-to-warn claim fails for the same reasons that Ms. Elward's does. First, there is no evidence that Electrolux knew its dishwashers were "unreasonably dangerous." *Blackwell*, 157 Cal. App. 3d at 377, 203 Cal. Rptr. at 710. Neither party points to differences between the knowledge requirements imposed for failure to warn claims in Illinois and California; like Ms. Elward, then, Ms. Williams fails to raise a dispute of material fact on Defendant's duty to warn. This alone necessitates dismissal of her claim.[12]

### C. Brittenham

Ms. Brittenham raises strict liability theories of failure to warn and design defect under the state of Washington's Product Liability Act, RCW § 7.72 *et seq.* (*See* CAC ¶¶ 221–36.) Defendant argues that Ms. Brittenham's claim is untimely, and that her claims nonetheless fail because she has not raised a triable issue of fact as to proximate cause. The court discusses each argument in turn.

#### 1. Timeliness

The Washington Product Liability Act carries a statute of limitation of three years from the date the claimant discovered the harm. RCW § 7.72.060(3). Specifically, the limitations period begins when the plaintiff has "discovered, or in the exercise of due diligence should have discovered, a factual causal relationship of the product to the harm." *N. Coast Air Servs., Ltd. v. Grumman Corp.*, 111 Wash. 2d 315, 319, 759 P.2d 405, 406 (1988). This so-called "discovery rule" means that "the cause of action accrues at the time the plaintiff knew or should have known all of the essential elements of the cause of action." *Gevaart v. Metco Const., Inc.*, 111 Wash. 2d 499, 501, 760 P.2d 348, 349 (1988). Despite

---

[12] The parties devote their time to arguing about causation. As noted, Plaintiffs have not established a duty to warn, but they are unable to meet their burden on causation, either. Even assuming Electrolux knew of an unreasonable flood or fire danger plaguing its dishwashers, no evidence in the record suggests that Ms. Williams would have heeded it, or that a different warning would have been effective. For example, the dishwashers' Use & Care Manual already warned of "the risk of fire, electrical shock, or injury when using your dishwasher," and suggested precautions; Ms. Williams testified to having read that warning at some point before her dishwasher malfunctioned (Williams Dep., Ex. D to MSJ [325-1] at 91–92), and she acknowledged she could not identify what other or additional type of warning Electrolux could have given. (DSOF ¶ 16.)

this, the Washington Supreme Court has made clear that "the discovery rule does not require knowledge of the existence of a legal cause of action," as such a requirement "would effectively do away with the limitation of actions until an injured person saw his/her attorney." *Id.*

The parties disagree as to when the limitations period began to run on Ms. Brittenham's claim. On careful consideration, the court concludes that her claim is time-barred. Two Washington cases from 1988 suggest the contours of Washington's discovery rule. In *Grumman*, the plaintiffs—survivors of a pilot who died when amphibious airplane crashed—sued the airplane's manufacturer twelve years after the accident. 111 Wash. 2d at 317, 759 P.2d at 405. After the crash, the "investigating authorities" had informed the deceased man's father that pilot error had caused the crash and that there was "no mechanical defect in the plane." *Id.* at 317, 759 P.2d at 405–06. More than a decade later, plaintiff learned of defects involving the Grumman aircrafts, as well as "other incidents involving this aircraft in which the plane crashed following a stall." *Id.* Applying the test, the court found that the limitations period did not begin to run until the plaintiffs discovered the existence of the defect—to find otherwise, where the father had been told there was no defect, "would require plaintiffs to begin a suit before they . . . had any knowledge of a possible legal responsibility of this defendant." *Id.* at 323, 759 P.2d at 408–09.

In the other case, *Gevaart*, a woman slipped on the top stair of a staircase that was unusually sloped. The day of her fall, the plaintiff "knew the step sloped." *Gevaart*, 111 Wash. 2d at 502, 760 P.2d at 349. The court found this was enough to start the limitations period; with "due diligence she could have determined that the step did not conform to the building code," and because she failed to do so, her claim was barred by the time she filed. *Id.*

As the court reads the cases, Ms. Brittenham's situation is more like *Gevaart* than *Grumman*. A fire department official told Ms. Brittenham on the night of the fire that the dishwasher may have been its origin. (DSOF ¶ 113.) That same day, she made a point of noting that the "dishwasher was running" when filling out a witness statement for the fire investigation—an indication, she testified,

that the dishwasher was a suspected culprit. (*Id.* ¶¶ 114–15.) From the get-go, then, Ms. Brittenham had reason to—and did—suspect that the dishwasher caused the fire in her home. Unlike *Grumman*, there was no indication or investigatory report misleading her by stating that something *other* than the dishwasher had caused the fire. And like *Gevaart*, she "had a fair chance to ascertain what caused" the injury from day one. *Padilla v. Merch. Inventives, Inc.*, 126 Wash. App. 1050 (2005) (finding no tolling where plaintiff was injured by falling sign in a retail store and, after immediately suing the retail store, chose more than three years later to sue the manufacturer of the hooks holding up the sign). And though there could always be other causes—some foreign, flammable object in or near the dishwasher, or the fire ultimately being found to have originated elsewhere—Washington's discovery rule "does not require 'absolute[] certain[ty]' of the cause of harm" before the period begins to run. *Hoefs v. Sig Sauer Inc.*, No. 3:20-CV-05173-RBL, 2020 WL 3488155, at *3 (W.D. Wash. June 26, 2020) (quoting *Holbrook, Inc. v. Link-Belt*, 103 Wn. App. 279, 12 P.3d 638 (Wash. Ct. App. 2000)). Put differently, it does not matter, as Plaintiffs suggest, that the fire official did not tell Ms. Brittenham about the specific dishwasher defect she would later allege, or "of the potential *legal claims* she could bring." (MSJ Resp. at 5 (emphasis in original).) Washington law does not appear to impose such a requirement. *See Gevaart*, 111 Wash. 2d at 501, 760 P.2d at 349 (rejecting notion that the discovery rule requires knowledge of the legal claim). The court thus concludes that once she suspected that her dishwasher had started the fire that night—as the undisputed facts in the record demonstrate—Ms. Brittenham had constructive knowledge of her claim.

## 2. Washington Product Liability Act Claims

Though her claims fail on timeliness grounds, the court briefly notes that they would face the same problems on the merits as Ms. Elward's and Ms. Williams'.

To prove a failure to warn claim under Washington law, Ms. Brittenham must show that an inadequate warning proximately caused her harm. *Hiner v. Bridgestone/Firestone, Inc.*, 138 Wash. 2d 248, 256, 978 P.2d 505, 509 (1999) ("Respondent must show that the absence of a warning of possible

dangers from specific tire usage as applied was the proximate cause of her injuries.") In *Hiner*, plaintiff alleged that defendant tire manufacturer had failed to warn consumers of the risks of appending studded snow tires only to the front wheels of a front-wheel drive car. The Washington Supreme Court affirmed the trial court's entry of judgment as a matter of law in the defendant's favor—reversing an intermediate appellate decision to the contrary—because the plaintiff had not identified "substantial evidence in the entire record upon which a reasonable jury could infer that, but for the absence of warnings, Respondent's accident and injuries would not have occurred." *Id.* at 258, 978 P.2d at 510. Specifically, the court pointed to plaintiff's testimony that "she had not read the notice in her Hyundai owner's manual" warning of "poor handling" in snow without using studded tires, and her "testimony d[id] not support her bare assertion that she would not have placed the studded snow tires on the front wheels of her automobile even if warnings had been imprinted on them." *Id.* at 257–58, 978 P.2d at 510.

As Defendant points out, it is undisputed here as well that Ms. Brittenham did not read the safety information included with her dishwasher. (DSOF ¶ 106; DSOF Resp. ¶ 106.) Even assuming that Electrolux bore a duty to warn of some additional risk of flooding or fires—which, as discussed above, the record does not support—there is no genuine dispute about whether a different warning might have changed Ms. Brittenham's decision to purchase or use the dishwasher, given she did not read safety information included with it. *See Hiner*, 138 Wash 2d. at 257–58, 978 P.2d at 510.

Finally, like Ms. Elward and Ms. Williams, Ms. Brittenham is unable to establish a defect. The Washington Product Liability Act imposes liability on a manufacturer whose "product was not reasonably safe as designed." RCW § 7.72.030(1). The law's definition of "not reasonably safe" mirrors the risk-utility test. RCW § 7.72.030(1)(a) ("A product is not reasonably safe as designed, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, outweighed the burden on the manufacturer to design a product that would have prevented those harms and the adverse effect that an alternative design that

was practical and feasible would have on the usefulness of the product.") As discussed above, Plaintiffs have not raised a triable issue of fact on such a claim. Ms. Brittenham's claims would be dismissed even if they were timely filed.

## IV. Consumer Protection Claims

In addition to product liability claims, the parties devote significant attention to various Plaintiffs' claims under different states' consumer protection laws. The court discusses each implicated state law in turn, and ultimately concludes that each claim must be dismissed.

### A. California

Ms. Williams and Mr. McLaughlin each raise claims under California's consumer protection laws: namely, California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, and the California Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.* (CAC ¶¶ 276–91.) They seek solely equitable relief, namely, "an order requiring Electrolux to adequately disclose and repair the problems in its dishwashers," along with restitution and disgorgement of Electrolux's profits, and "reasonable attorneys' fees and costs." (*Id.* ¶¶ 6, 90, 283, 290.)

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. As a prohibited practice, Plaintiffs mainly allege that Electrolux "knowingly conceals and fails to disclose that its dishwashers are dangerously defective and that they overheat and catch fire." (CAC ¶ 280.) Similarly, the CLRA prohibits certain "unfair methods of competition and unfair or deceptive acts or practices" in the "sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). Here too, Plaintiffs' allegations hinge on Electrolux allegedly concealing that their dishwashers were "dangerously defective" when selling them to Ms. Williams and Mr. McLaughlin. (CAC ¶¶ 287–88 ("[I]n connection with the marketing and sale of its dishwashers . . . Electrolux failed to disclose material information—namely that its dishwashers are dangerously defective.").)

Defendant argues that Ms. Williams and Mr. McLaughlin lack standing to pursue injunctive relief; that they have not proven a defect, on which their theories of liability rely; and that they have

not proven a predicate violation of California law as contemplated for UCL claims. (MSJ at 35.) In response to Defendant's arguments, Plaintiffs acknowledge that Ms. Williams lacks standing, but maintain that Mr. McLaughlin's claim is properly in federal court. The court agrees with Defendant, however, that neither Plaintiff has standing to pursue injunctive relief.

The plaintiff bears the burden to show that she has standing to sue in federal court for the specific relief she seeks. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). A plaintiff seeking an injunction must show that there is an "actual and imminent" threat of her suffering concrete and particularized "injury in fact," "fairly traceable to the challenged action of the defendant," and that it is "likely that a favorable judicial decision will prevent or redress the injury." *Id.* (citing *Friends of Earth, Inc. v. Laidlaw Env'l Services (TOC), Inc.,* 528 U.S. 167, 180–181 (2000)). Any threat of future injury must be "imminent, not conjectural." *Summers*, 555 U.S. at 493.

There is no evidence here that Mr. McLaughlin suffers an imminent threat of future injury sufficient to support standing to seek an injunction against Electrolux. In consumer protection claims seeking injunctions, courts look for "some concrete basis to conclude that the plaintiffs will or must purchase the product again in the future and be deceived." *Geske v. PNY Techs., Inc.*, 503 F. Supp. 3d 687, 702 (N.D. Ill. 2020) (quoting *Benson v. Fannie May Confections Brands, Inc.*, No. 17 C 3519, 2018 WL 1087639, at *5 (N.D. Ill. Feb. 28, 2018)); *see also Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 741 (7th Cir. 2014) (finding that individual could not seek injunction against clothing retailer for unfair trade practices in part because the plaintiff "is now aware of JAB's sales practices, [and] he is not likely to be harmed by the practices in the future").

Plaintiffs admit that Ms. Williams, who testified that she did not want any another Frigidaire product in her home, did not demonstrate imminent future injury. (MSJ Resp. at 13; *see also* DSOF ¶ 25.) And the parties agree that Mr. McLaughlin's standing hinges on whether he would purchase another dishwasher from Defendant. (MSJ at 35–36; MSJ Resp. at 13.) Plaintiffs contend that because Mr. McLaughlin, unlike Ms. Williams, did not explicitly say he would not buy another

Electrolux dishwasher, he has standing to pursue injunctive relief. (MSJ Resp. at 13 (noting that because "Electrolux offers no similar testimony from Plaintiff McLaughlin. . . . there remains a genuine issue of material fact as to Plaintiff McLaughlin's standing to seek injunctive relief under the UCL and CLRA").)

The court agrees with Defendant that Ms. McLaughlin's silence on this issue is not enough to raise a genuine dispute of fact as to whether standing exists. *Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 939 (7th Cir. 2016) ("The party invoking federal jurisdiction bears the burden of establishing standing, and the elements of standing must be supported with the quantum of evidence required at each successive stage of litigation."); *see also Celotex*, 477 U.S. at 322–23 (noting that summary judgment is required "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Plaintiffs here have simply pointed to the absence of evidence—namely, no statements from McLaughlin concerning his plans whether *or not* to buy another dishwasher from Electrolux. They point the court to no other evidence that after his negative experience with the Frigidaire and the availability of alternative products, McLaughlin was nevertheless likely to purchase another Frigidaire, warning included or not. Since no evidence shows that McLaughlin faces an imminent threat of future harm, he too lacks standing to pursue his UCL and CLRA claims.

### B.  Illinois

Ms. Elward asserts a claim under Section 2 of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.* (CAC ¶¶ 142–61.) Section 2 prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including . . . the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact" with the intention—and result—that a consumer rely on it. 815 ILCS 505/2. Ms. Elward's ICFA claim is predicated on Electrolux's "intentionally conceal[ing] the unreasonable safety risks associated with [its] defective dishwashers," and the

argument that "no reasonable consumer would have knowingly bought a dishwasher for use if that consumer had known that the product was designed with a serious defect." (CAC ¶ 150.) Specifically, Ms. Elward alleges that Electrolux engaged in "intentional misrepresentations, omissions and concealments of material fact [to] constitute unfair and/or deceptive practices" violating ICFA. (*Id.* ¶ 152.)

There are numerous problems with Ms. Elward's claim, many of which are familiar by now. As discussed above repeatedly, there is no genuine factual dispute concerning whether Electrolux's dishwashers suffered a "latent defect"—the "unfair or deceptive" practice they allege. (MSJ Resp. at 14–16.) The only possible conclusions a jury could draw on the record before the court are that Electrolux did not know its product "was designed with a serious defect"; or, instead, that no defect existed at all.

Moreover, there is no evidence in the record raising a triable issue as to whether, assuming Defendant deceptively marketed its product, Ms. Elward relied on such misrepresentations in buying her dishwasher. "If the plaintiff has neither seen nor heard a deceptive statement, it cannot have relied on the statement and, consequently, cannot prove that the statement was the proximate cause of its injury." *Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, __ N.E. 3d. __, 2024 IL 129183, ¶ 26 (Ill. 2024) (citing *De Bouse v. Bayer*, 235 Ill. 2d 544, 555, 922 N.E.2d 309, 316 (2009)). Here, as Defendant points out, evidence does not support the notion that Ms. Elward relied on any statements or advertisements from Electrolux when buying her product. She did online research and claimed to have seen "representations regarding the Dishwashers," but could not remember their substance, and instead testified only to relying on information online concerning the Frigidaire's price. (DSOF ¶¶ 78–81). And she admitted that Defendant never made affirmative "oral[] or written" statements to her that factored into her decision to buy her dishwasher. (*Id.* ¶ 84.) Any reliance argument thus fails—there is no record evidence suggesting that Electrolux's statements (or omissions) duped Ms. Elward into buying a defective product. *See De Bouse*, 235 Ill. 2d at 554, 922 N.E.2d at 316 (noting

28

that to state an ICFA claim the plaintiff must have been deceived by either "a statement *or omission*" (emphasis added)).

Plaintiffs tacitly acknowledge this deficit in their response by switching tack; they turn to arguing that Ms. Elward's claim nonetheless has legs as an "unfair," as opposed to "deceptive," trade practice prohibited under ICFA. (MSJ Resp. at 15–16.) But this claim, too, fails. For one, the "unfair" practice Ms. Elward alleges remains predicated on selling a product with a hidden defect. (*See* MSJ Resp. at 14–16). This remains a nonstarter for reasons already explained. Moreover, Ms. Elward's ICFA claim is clearly predicated on misrepresentation, and it is unclear what unfair practice she alleges separate and apart from fraudulent omission.[13] *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) (in pleading context, refusing to allow ICFA plaintiff alleging misrepresentation theory to rely on the ICFA's "unfair" language and thus get around heightened pleading standard for fraud).

Defendant is entitled to summary judgment on Ms. Elward's ICFA claim.

### C.    Washington

Ms. Brittenham raises a claim under the Washington Consumer Protection Act ("WCPA"), RCW § 19.86.010 *et seq.* (CAC ¶¶ 201–20.) The law prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW § 19.86.020. To prevail on a WCPA claim, a plaintiff must prove 1) an unfair or deceptive practice; 2) involving "trade or commerce"; 3) "affecting the public interest"; 4) injury; and 5) causation. *Young v. Toyota Motor Sales, U.S.A.*, 196 Wash. 2d 310, 316, 472 P.3d 990, 994 (2020) (citing *Panag v. Farmers Ins. Co. of Wash.*,

---

[13]    As far as the court can tell, Plaintiffs point only to the following sentence as evidence of "unfairness" separate from deception: "Plaintiffs present a jury question as to whether Electrolux's design and marketing of dishwashers, which suffer from a dangerous, latent defect, caused substantial injury to consumers that could not have been easily avoided." (MSJ Resp. at 14, 16.) But unfair "marketing" of the dishwashers appears to be a repackaging of the deception allegations on which Plaintiffs have relied throughout. (*See* CAC ¶¶ 147–56 (in stating ICFA claim, repeatedly arguing that Electrolux knew of dangerous defect and intentionally concealed it via marketing and otherwise, without stating separate grounds for unfairness).)

166 Wash.2d 27, 37, 204 P.3d 885, 889 (2009)). In a familiar refrain, Plaintiffs allege that the "unfair or deceptive practice" in question was Electrolux's concealment of a known defect in its dishwashers. (*See* CAC ¶¶ 206–15.) The parties primarily dispute whether Plaintiffs have raised a triable issue on the existence of such a defect and on causation.

On the latter, Plaintiffs argue that they are entitled to a rebuttable presumption of reliance (and thus causation) under Washington law because they state a theory of omission as opposed to affirmative misrepresentation. (MSJ Resp. at 17–18.) The court agrees. *See White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1197 (9th Cir. 2024) ("Washington law recognizes such a rebuttable presumption for claims grounded in omissions, premised on the idea that otherwise the person seeking relief would have to prove a negative." (citing *Deegan v. Windermere Real Estate/Ctr.-Isle, Inc.*, 197 Wash.App. 875, 391 P.3d 582, 587–88 (2017))).

Silence about a known risk can, thus, establish causation—but only if Ms. Brittenham must can raise a triable issue concerning such a known risk. And here, she fails. Recall that Ms. Brittenham relies on the notion that Electrolux concealed evidence of its product defect. But the only evidence in the record is that two Electrolux dishwashers caught fire at some point due to an unspecified manufacturing—not design—defect in the two units' heating elements, and that Electrolux knew the heating elements it used in some of its dishwashers could warp. Without evidence of a design defect and given that *any* product "would still have a propensity to fail sometimes," *Elward*, 2020 WL 2850982, at * 17, the record does not suggest that Electrolux made a material omission from its marketing or other materials. The court thus grants summary judgment on her WCPA claim.

## V.    Negligence Claims

Plaintiffs Williams, Elward, and the Fitzgeralds bring claims asserting negligent design and negligent failure to warn. (CAC ¶¶ 120–41.) The court presents a brief overview of the law applicable to these claims: California law applies to Ms. Williams' claims; Illinois, to Ms. Elward's; and Virginia law applies to the Fitzgeralds' claims. (*See* CAC ¶¶ 7, 12, 14.)

1.       **Negligent Design**

In California, a negligence action predicated on negligent design is substantially equivalent to a product liability design defect claim; "[t]hus, under either a negligence or a strict liability theory of products liability, to recover from a manufacturer, a plaintiff must prove that a defect caused injury" and that the product design's "likelihood of harm" and its "gravity" are not outweighed by the "burden of the precaution which would be effective to avoid" it. *Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 479, 28 P.3d 116, 124–25 (2001) (finding that plaintiffs suing gun manufacturer could not elude statute that prohibited products liability claims by packaging claim as a negligence action). Similarly, for negligence actions intermixed with products liability, Virginia law defines a manufacturer's duty "to exercise ordinary care to design a product that is reasonably safe for the purpose for which it is intended"—essentially, the risk-utility test. *Holiday Motor Corp. v. Walters*, 292 Va. 461, 477, 790 S.E.2d 447, 455 (2016) (quoting *Turner v. Manning, Maxwell & Moore, Inc.*, 216 Va. 245, 251, 217 S.E.2d 863, 868 (1975)). And in Illinois, "the key question in a negligent-design case is whether the manufacturer exercised reasonable care in designing the product." *Jablonski v. Ford Motor Co.*, 2011 IL 110096, ¶ 83, 955 N.E.2d 1138, 1154.

Because a plaintiff must prove a design defect as part of each state's negligent design tort, Ms. Elward's and Ms. Williams' negligence claims fails for the same reasons the court dismissed their products liability claims. Nor does any evidence in the Fitzgeralds' case somehow distinguish them. In fact, the Fitzgeralds face an additional problem in that, even assuming the dishwashers were negligently designed, the Defendants have presented undisputed evidence that points to other causes of their dishwasher fire. True, Ms. Fitzgerald testified that the night of the fire, a fire-department official told her their "best guess" was that the dishwasher's "electrical panel" or heating element had caused the fire; Mr. Fitzgerald testified that he believed the heating element was the culprit; and the Fitzgeralds reported in a phone call to Electrolux that "the fire department and insurance company say it was a faulty dishwasher." (DSOF ¶¶ 146, 149, 160.) But the only direct evidence in the

record[14]—an inspection of the dishwasher conducted by the insurance company, through a consultant—found "no evidence that the fire started on the heating element" and that "[t]here were no indications of any manufacturing defects in the dishwasher." (DSOF ¶¶ 153–58.) Even on the issue of causation, then, the evidence does not support a finding that the defect alleged by Plaintiffs caused the Fitzgerald's fire.

In sum, the evidence in the record is insufficient to raise factual disputes as to whether Electrolux weighed the benefits and demerits of its dishwashers' design, as well as whether their design was defective. Defendant is entitled to summary judgment on Plaintiffs' negligent design claims.

### 2. Failure to Warn

Negligent failure-to-warn claims differ slightly between the three states, but the parties fail to explore those differences and they do not change the outcome here. In California, negligent failure-to-warn claims "require[] a plaintiff to prove that a manufacturer or distributor did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer would have known and warned about." *Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal. 3d 987, 1002, 810 P.2d 549, 558 (1991). In Illinois, a plaintiff "must show that 'the defendant manufacturer knew or should have known of the danger that caused the injury, and that the defendant manufacturer failed to warn plaintiff of that danger.'" *Daniels v. ArvinMeritor, Inc.*, 2019 IL App (1st) 190170, ¶ 71, 146 N.E.3d 655, 676 (quoting *Startley v. Welco Manufacturing Co.*, 2017 IL App (1st) 153649, ¶ 43, 413 Ill.Dec. 647, 78 N.E.3d 639). And in Virginia, manufacturers are liable for negligent failure to warn when they 1) "know[] or ha[ve] reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied"; 2) have reason to think that a user will not

---

[14] Indeed, though neither party addresses it, the statements reportedly made by fire department officials and insurance company representatives are likely hearsay, inadmissible at this stage absent an affidavit or other indication that the specific fire-department official who made the out-of-court statement would testify at trial. *See* FED. R. EVID. 801; *see also Aguilar*, 861 F.3d at 631 (noting that evidence at summary judgment must be that which would be admissible at trial).

realize the product's danger; 3) and "fail[] to exercise reasonable care to inform them of its dangerous condition." *Featherall v. Firestone Tire & Rubber Co.*, 219 Va. 949, 962, 252 S.E.2d 358, 366 (1979).

Defendant argues, as above, that "[t]here is no duty to warn of an alleged defect that does not exist." (MSJ at 43.) Rather than meeting this argument, Plaintiffs simply repeat that they "did present evidence sufficient to create a genuine issue of material fact regarding whether the dishwashers' propensity to cause fires and/or floods resulted from a systemic defect created by Electrolux's poor design and component choices," while simultaneously acknowledging that "the court disagreed with them on these points." (MSJ Resp. at 19, 19 n.13.) This court likewise disagrees with Plaintiffs with respect to their strict-liability failure-to-warn claims; Plaintiffs have failed to present evidence from which a reasonable jury could find that Electrolux knew its products were dangerous and thus owed a duty to warn.

## VI. Fraudulent Concealment

Finally, the court briefly turns to Plaintiffs' claims of fraudulent concealment. All Plaintiffs bring a fraudulent concealment claim, so the laws of California, Illinois, Ohio, Washington, and Virginia apply. The laws each hold a defendant liable for intentionally concealing a material fact that they bore a duty to disclose to the plaintiff, with the intent to defraud the plaintiff, where such concealment caused the plaintiff's harm.[15] Defendant argues that Plaintiffs' claim hinges on

---

[15] For California, see *Mktg. W., Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal. App. 4th 603, 612–13, 7 Cal. Rptr. 2d 859, 864 (1992) (fraudulent concealment requires: 1) the defendant concealed a "material fact"; 2) that it was "under a duty to disclose . . . to the plaintiff"; 3) it concealed this information with intent to defraud the plaintiff; 4) the plaintiff was unaware of the concealed fact and would have acted differently had she known of it; and 5) the concealment caused damage to plaintiff); for Virginia, see *Van Deusen v. Snead*, 247 Va. 324, 328, 441 S.E.2d 207, 209–10 (1994) (claim is predicated on: "(1) a false representation [or omission], (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him."); for Ohio, see *Cohen v. Lamko, Inc.*, 10 Ohio St. 3d 167, 169, 462 N.E.2d 407, 409 (1984) (claim requires concealment, despite a duty to disclose, of a material fact, made intentionally to induce reliance, which caused such reliance and the resulting injury); for Illinois, see *Weidner v. Karlin*, 402 Ill. App. 3d 1084, 1087, 932 N.E.2d 602, 605 (3d Dist. 2010) (claim requires "(1) a false statement or omission of material fact; (2) knowledge or belief of the falsity by the party making it; (3) intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statements;

Electrolux's failing to disclose "the purported common 'system' defect." (MSJ at 44 (citing CAC ¶ 301).) Plaintiffs, in turn, concede as much, stressing that "the Defect did exist, which affected all consumers' dishwashers" and that "Electrolux was aware of this Defect, but ultimately refused to warn consumers about it." (MSJ Resp. at 20.) Plaintiffs maintain that there is a triable issue of fact as to "Electrolux's intent to conceal a material fact—namely, the propensity of its dishwashers to cause fires and/or floods as a result of a systemic defect." (*Id.*) But as already stated, there is no evidence in the record of a systemic defect that Plaintiffs believe Electrolux fraudulently concealed. For this reason alone, summary judgment is warranted on Plaintiffs' fraudulent concealment claims.[16]

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment [322] is granted. Judgment will enter in favor of Defendant and against all Plaintiffs.

ENTER:

Dated: August 5, 2024

_____
REBECCA R. PALLMEYER
United States District Judge

---

and (5) damage to the other party resulting from such reliance."); and for Washington, see *Schreiner Farms, Inc. v. Am. Tower, Inc.*, 173 Wash. App. 154, 163, 293 P.3d 407, 412 (2013) ("To establish fraudulent concealment, the plaintiff may either 'affirmatively plead and prove the nine elements of fraud' or 'simply show that the defendant breached an affirmative duty to disclose a material fact.'" (quoting *Crisman v. Crisman,* 85 Wash. App. 15, 21, 931 P.2d 163 (1997))).

[16]    Even if there were an evidentiary dispute concerning the existence of such a defect, Plaintiffs do not point to evidence indicating that Electrolux knew about it and intentionally concealed it. The uncontroverted evidence in the record is that Electrolux had not determined a "root cause" of the heating-element warping it had observed (let alone whether that warping caused fires or leaking) and the two fires that had been reported. (*See* DSOF ¶¶ 169–74; *Elward*, 2020 WL 2850982, at *18.) Plaintiffs do not explain what evidence shows Electrolux's intent to conceal its knowledge that its products were dangerous—indeed, the dishwashers' manual already disclosed a risk of fire. (*See* DSOF ¶¶ 14–15, 26, 43, 72, 85, 107.) Then, even assuming knowing concealment of a defect, the Plaintiffs would need to prove reliance on that omission—which, as discussed above, runs into its own problems for various of the Plaintiffs.